UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

ERIC DEON ROBINSON,

    Petitioner,

v.

GABRIELA NAJERA,[1] *et al.*,

    Respondents.

Case No. 2:21-cv-01989-RFB-DJA

ORDER

### I. INTRODUCTION

Eric Deon Robinson is a Nevada prisoner who was convicted of conspiracy to commit kidnapping, first-degree kidnapping with use of a deadly weapon, coercion with use of a deadly weapon, two counts of first-degree kidnapping with use of a deadly weapon resulting in substantial bodily harm, attempted murder with use of a deadly weapon, and first-degree murder with use of a deadly weapon. Robinson filed an amended petition for writ of habeas corpus (ECF No. 20) under 18 U.S.C. § 2254. The Court denies the remaining grounds of Robinson's Petition, denies him a certificate of appealability, and directs the Clerk of Court to enter judgment accordingly.

### II. BACKGROUND

    a. Facts Underlying Conviction[2]

In February 2012, Cody Lucas ("Lucas") and Mario Camacho ("Camacho"), Robinson's

---

[1] According to the state corrections department's inmate locator page, Robinson is incarcerated at Southern Desert Correctional Center ("SDCC"). See https://ofdsearch.doc.nv.gov/form.php. The department's website reflects that Ronald Oliver is the warden of that facility. See https://doc.nv.gov/Facilities/SDCC_Facility/. At the end of this Order, the Court directs the Clerk of the Court to substitute Petitioner's current immediate physical custodian, Ronald Oliver, as Respondent for the prior Respondent Gabriela Najera pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

[2] The facts underlying the conviction are derived from Robinson's opening brief on direct appeal, see ECF No. 22-17, and the state district court's order denying Robinson's state petition for writ of habeas corpus. See ECF No. 22-45.

co-defendant, went to the home of Frankie Wiest ("Wiest"), and took Wiest to Camacho's house. Robinson arrived at Camacho's house, and they left to pick up two other men who were not identified at trial. The group returned to Camacho's house, and Robinson and Camacho threatened Lucas and Wiest, questioning them about missing money, drugs, and a stolen firearm.

The group left Camacho's house. While driving, Camacho recognized B.S., Wiest's girlfriend, and rammed her car off the road. Camacho approached B.S.'s car with his firearm and ordered her to move to the passenger seat. The group drove to a nearby park where Camacho threatened B.S. at gunpoint about missing money and drugs. The group then drove to B.S.'s grandmother's home to search B.S.'s room for money and drugs. After searching her room and finding no money or drugs, the group drove back to Camacho's house.

Robinson and Camacho directed Wiest and B.S. into the garage at gunpoint. Camacho ordered B.S. upstairs to his bedroom to interrogate her. Robinson entered the bedroom, ordered B.S. to take her clothes off, and ordered her to get on her hands and knees while holding a gun to her head. Camacho pleaded with Robinson to not rape her. Robinson threatened to kill B.S. if she told anyone. Camacho gave B.S. her clothes and she got dressed. Wiest and Lucas entered the room and Camacho continued to interrogate Wiest, Lucas, and B.S.

The group went into Camacho's garage. In the garage, Robinson pointed a gun at B.S., ordered her to sit on a stool, and told her to face the wall. Lucas and Wiest were each facing Camacho as Camacho pointed guns at them. Camacho shot both Lucas and Wiest in the head, killing Wiest and severely wounding Lucas. Camacho stood over Lucas, called 9-1-1, and directed Lucas to tell anyone who asked that an African American entered the garage and shot Lucas. Robinson and Camacho allowed B.S. to leave with one of the unidentified men, who drove her a few blocks away, leaving her with her car. Robinson fled with the weapons.

b. **PROCEDURAL HISTORY**

Following a nine-day trial wherein Robinson and Camacho were tried together, the jury found Robinson guilty of conspiracy to commit kidnapping, first-degree kidnapping with use of a deadly weapon, coercion with use of a deadly weapon, two counts of first-degree kidnapping with use of a deadly weapon resulting in substantial bodily harm, attempted murder with use of a deadly

weapon, and first-degree murder with use of a deadly weapon. The Nevada Supreme Court affirmed the conviction. In June 2020, Robinson filed a state petition for writ of habeas corpus. The state court denied post-conviction relief and the Nevada Supreme Court affirmed the denial of relief.

Robinson initiated this federal habeas corpus proceeding *pro se*. See ECF No. 1. Following appointment of counsel, Robinson filed an amended habeas petition. See ECF Nos. 14, 20. The Court granted Respondents' motion to dismiss, in part, dismissing Ground Three as untimely. See ECF No. 29.

### III.     GOVERNING STANDARDS OF REVIEW

#### a.     REVIEW UNDER THE ANTITERRORISM AND EFFECTIVE DEATH PENALTY ACT

28 U.S.C. § 2254(d) sets forth the standard of review generally applicable in habeas corpus cases under the Antiterrorism and Effective Death Penalty Act ("AEDPA"):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254(d), "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court." Lockyer v. Andrade, 538 U.S. 63, 73 (2003) (first quoting Williams v. Taylor, 529 U.S. 362, 405–406 (2000), and then citing Bell v. Cone, 535 U.S. 685, 694 (2002)).  A state court decision is an unreasonable application of clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's

case." Id. at 75.

The Supreme Court has instructed that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (citing Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).

### b. Standard for Evaluating an Ineffective Assistance of Counsel Claims

In Strickland, the Supreme Court propounded a two-prong test for analysis of ineffective assistance of counsel claims requiring Petitioner to demonstrate that: (1) counsel's "representation fell below an objective standard of reasonableness[;]" and (2) counsel's deficient performance prejudices Petitioner such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 688 & 694 (1984). Courts considering an ineffective assistance of counsel claim must apply a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689. It is Petitioner's burden to show "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." Id. at 687. Additionally, to establish prejudice under Strickland, it is not enough for Petitioner to "show that the errors had some conceivable effect on the outcome of the proceeding." Id. at 693. Rather, errors must be "so serious as to deprive [Petitioner] of a fair trial, a trial whose result is reliable." Id. at 687.

Where a state court previously adjudicated the ineffective assistance of counsel claim under Strickland, establishing the court's decision was unreasonable is especially difficult. See Richter, 562 U.S. at 104–105. In Richter, the Supreme Court clarified that Strickland and § 2254(d) are each highly deferential, and when the two apply in tandem, review is doubly so. See id. at 105; see also Cheney v. Wash., 614 F.3d 987, 995 (9th Cir. 2010) (internal quotation marks omitted). The Court further clarified, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Richter, 562 U.S. at 105.

## IV. DISCUSSION

### a. GROUND ONE—BATSON CHALLENGE

In Ground One, Robinson alleges that the State exercised peremptory challenges with discriminatory intent in violation of his equal protection rights. He alleges that the State's peremptory challenges of two African American jurors, Marquita James ("James") and Judith Barnes ("Barnes"), were racially motivated and prohibited by Batson v. Kentucky, 476 U.S. 79 (1986). During jury selection, defense counsel objected to the prosecution's removal of prospective jurors who were African American because it disproportionately reduced African American representation on the jury panel.

#### i. Additional Background Information

#### 1. Marquita James, Badge Number 665

James provided as follows regarding her brother that was a defendant in a criminal case during general *voir dire*:

> **Ms. Rhoades:** You or family members or close friends ever been accused of a crime?
>
> **Prospective Juror No. 665:** Yes.
>
> **Ms. Rhoades:** Okay. Tell me about that.
>
> **Prospective Juror No. 665:** My brother has been accused of involuntary manslaughter.
>
> **Ms. Rhoades:** Is that here or –
>
> **Prospective Juror No. 665:** In California. …
>
> **Prospective Juror No. 665:** . . . I believe he's awaiting trial.
>
> **Ms. Rhoades:** Right now.
>
> **Prospective Juror No. 665:** Correct.
>
> **Ms. Rhoades:** Do you know – are you following that case closely?
>
> **Prospective Juror No. 665:** No. He calls but I don't accept. I went to visit him once. I went to go visit my mother and she wanted to go see him and I took her. And outside of that, I haven't really had much contact. I haven't been a pen pal or anything like that. …

> **Ms. Rhoades:** Do you know who was killed?
>
> **Prospective Juror No. 665:** It was his girlfriend and they had just recently broke up. So, like on Sunday they were together. They decided to break up on Monday and on Tuesday they decided to go somewhere on a [motor] bike. There was an accident and she didn't make it. …
>
> **Ms. Rhoades:** Oh. And they were both on the motor bike.
>
> **Prospective Juror No. 665:** Correct.
>
> **Ms. Rhoades:** And something happened with that bike. Do you know what happened –
>
> **Prospective Juror No. 665:** I don't. It crashed. I don't know much more details, but I know that it crashed.
>
> **Ms. Rhoades:** Is he in jail or is he out of jail awaiting trial?
>
> **Prospective Juror No. 665:** He's in jail.

ECF No. 21-39 at 122–25.

In addition, in response to questions related to whether James worked in law enforcement related jobs, she provided the following:

> **Mr. Schieck:** Have you ever worked in any law enforcement type of profession?
>
> **Prospective Juror No. 665:** I was a 9-1-1 dispatcher in Fort [indiscernible] California.
>
> **Mr. Schieck:** And that's after you got your [criminal justice] degree or while you were getting your degree?
>
> **Prospective Juror No. 665:** It was while I was getting my degree.
>
> **Mr. Schieck:** You never then applied to be a police officer or followed up on that type of profession?
>
> **Prospective Juror No. 665:** I have, but I haven't been selected.
>
> **Mr. Schieck:** You've applied to be a police officer?
>
> **Prospective Juror No. 665:** Not a police officer. I preferred to work in conjunction with law enforcement.

Id. at 126–27.

The prosecution proffered the following race-neutral justifications for striking James:

So as far as the race-neutral reasons, first with Marquita James, 665, she was a concern for us. One, she did talk about how she had a criminal justice background and she did state that she had applied to law enforcement-type jobs, but she was never selected. So that was a little bit concerning, knowing that we're going to have police officers and things of that nature testify. The second thing is that her brother is currently – it's not a past conviction where he's possibly serving time or a drug case that's since been closed – a brother that is currently facing trial and in custody awaiting trial on a voluntary manslaughter charge. So similar to the violent nature of the crimes in the case, her brother is awaiting trial on that voluntary manslaughter charge. And so that was a concern for us.

ECF No. 21-41 at 193.

## 2. Judith Barnes, Badge Number 533

Regarding Barnes's history as being a victim of a crime, she provided as follows during general *voir dire*:

> **Mr. Schieck:** Were you ever put in fear that you were going to be injured during the course of this robbery?
>
> **Prospective Juror No. 532:**[3] No.
>
> **Mr. Schieck:** You just happened to be there in line when someone else came in and –
>
> **Prospective Juror No. 532:** No. He was in line ahead of us. He was -- I was there with my kids and at that time my ex-husband, deceased husband, whatever, and he waited in line just like the rest of us. Went up, said something to the teller and she kind of got flustered and handed him some stuff and he turned around and walked out the bank. Then she fell apart.
>
> **Mr. Schieck:** So it was kind of a polite robbery, but the teller was traumatized.
>
> **Prospective Juror No. 532:** Yeah, very polite. …
>
> **Mr. Schieck:** Okay. And then, I think you said you had a home burglary in the early '80s. Was that here in Las Vegas? …
>
> **Prospective Juror No. 532:** It turned out he was the son of a lady that lived across the street two doors down from us or two doors down, and he hit the neighborhood. He evidently had a drug problem and he hit a bunch of the houses. He was a very polite one because he kicked the front door in, went into the room, took the jewelry and went out. He didn't turn over anything, didn't toss anything.
>
> **Mr. Schieck:** But it was, to your knowledge, he was doing that throughout the neighborhood to support his –
>
> **Prospective Juror No. 532:** There were several homes that were burglarized that

---

[3] The transcript refers to Barnes's badge number as badge number 532 in error. During *voir dire*, Barnes is first introduced by her full name and correct badge number. See ECF No. 21-40 at 96.

- 7 -

day.

ECF No. 21-40 at 101–103.

The prosecution proffered the following race-neutral justifications for striking Barnes:

> As far as Ms. Barnes, she – 533 – the most concerning thing for Ms. Barnes – and before I get into that, I do not want to talk about some of the facts of this case [. . .] so it was very concerning when Ms. Barnes talked about the person who went into her house, kicked the door, and didn't do anything but went straight back to the room and took her jewelry and then left. And she – she said that that was very polite of him. So that was – that was really concerning for the State. And those are the reasons – that's the reason – primary reason for Ms. Barnes. I also recall some questions – or some answers that she was giving to Mr. Langford when he was talking about the reasonable doubt as a bit concerning. But more than that, it was the polite person who came in and robbed her, and how it's similar to – to what Mr. Camacho's doing in this case.

ECF No. 21-41 at 194–95.

### ii. State Court Determination

The trial court denied the <u>Batson</u> challenge because the prosecution presented legitimate non-discriminatory reasons for striking James and Barnes:

> And I think that – that the fact that [James] was never selected by law enforcement and that we're – although she says that doesn't bother her, the fact that there's going to be law enforcement, that the State could be concerned, in fact, that she does have a bias against law enforcement, because she – she never was selected by law enforcement.
>
> And the fact that . . . that her brother is awaiting trial on a voluntary manslaughter charge, a very serious charge . . . And so while she said that wouldn't have any bearing on anything, I can see a concern by the State that she might, in fact, be putting herself, you know, thinking about her own brother's situation and putting things under a microscope or, you know, have that weighing on her mind.
>
> As to [Barnes], . . . it did concern me when – when she said – went on about how polite this criminal was, that she kind of gave him credit for not tossing her – ransacking her place, but just merely went to the -- grabbed her jewelry and left. . . .
>
> But somehow that someone should get credit, because even though they break into your house and steal your property that – that somehow they're a better criminal because they're polite and didn't do further damage in the house.
>
> I could see where that could be concerning to the State, given, yeah, the facts of this particular case, where, yes, we do have facts that are – are going to come out through one of the victims in this case that one of the defendants was seemingly being somewhat her protector. That – interfering to further potential damage or crimes committed against her when she was forced to undress in a – in a room in a

- 8 -

>very dangerous situation. Or the fact that one of the defendants decided to let her go instead of, you know, shooting her. That that could, in fact, enter into a juror's decision making process as opposed to focusing on what the facts are and applying the law to the facts.
>
>So I think the State has articulated a race-neutral explanation and that the opponent to the strike has not proved purposeful racial discrimination.

ECF No. 21-41 at 198–200.

>On direct appeal, the Nevada Supreme Court held:
>
>Robinson argues that the State violated his equal protection rights under the Fourteenth Amendment by using its peremptory challenges to strike two of the three African American prospective jurors from the jury panel—Prospective Juror Nos. 533 and 665. We disagree.
>
>The use of racially-motivated peremptory challenges violates the Equal Protection Clause of the Fourteenth Amendment. Batson, 476 U.S. at 89. When a defendant mounts an equal protection challenge to the State's use of its peremptory challenges, the district court evaluates the equal protection challenge using the three-part test outlined in Batson:
>
>. . .
>
>The proponent of the Batson challenge has the ultimate burden of demonstrating that the prosecution's race-neutral explanation is pretextual such that "it is more likely than not that the State engaged in purposeful discrimination." McCarty v. State, 132 Nev. 218, 226 (2016). This court reviews the district court's determination on discriminatory intent for clear error. Id.
>
>We conclude that Robinson has failed to demonstrate that the district court's determination was clearly erroneous. As required by step two of the Batson analysis, the State provided race-neutral explanations for striking both prospective jurors. The State explained that it struck Prospective Juror No. 533 because she had characterized a man who burglarized her home as "polite," showing that she may have a lenient view towards criminals. The State struck Prospective Juror No. 665 based on her previous unsuccessful attempts to obtain employment with a law enforcement agency and because her brother was on trial at the time for involuntary manslaughter. Robinson failed to show that either of these race-neutral explanations were pretextual or that the State engaged in purposeful discrimination. Thus, the district court did not err in rejecting Robinson's Batson challenge to the State's peremptory challenges to the two prospective jurors.

ECF No. 22-24 at 3–5.

### iii.  *Applicable Legal Standard*

The Supreme Court has held that the Equal Protection Clause forbids the challenging of potential jurors solely on account of their race. Batson, 476 U.S. at 93–94. In Batson, the Supreme Court outlined a three-step burden-shifting framework for evaluating claims of discrimination in

the exercise of peremptory challenges. At step one, the moving party bears the burden to "produc[e] evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." Johnson v. Cal., 545 U.S. 162, 170 (2005). Once the proponent makes a *prima facie* showing, "the burden shifts to the [prosecutor] to explain adequately the racial exclusion by offering permissible race-neutral justifications for the strikes." Id. at 168 (internal quotation marks omitted). Finally, at step three, "[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination." Id. (internal quotation marks omitted). "[T]he ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." Purkett v. Elem, 514 U.S. 765, 768 (1995) (*per curiam*).

To fulfill its duty, "the trial court must evaluate the prosecutor's proffered reasons and credibility under 'the totality of the relevant facts,' using all the available tools including its own observations and the assistance of counsel." Mitleider v. Hall, 391 F.3d 1039, 1047 (9th Cir. 2004) (quoting Lewis v. Lewis, 321 F.3d 824, 831 (9th Cir. 2003)). "As part of its evaluation of the prosecutor's reasoning, the court must conduct a comparative juror analysis—that is, it must 'compare African American panelists who were struck with those non-African American panelists who were allowed to serve.'" Jamerson v. Runnels, 713 F.3d 1218, 1224 (9th Cir. 2013) (quoting Briggs v. Grounds, 682 F.3d 1165, 1170 (9th Cir. 2012)). "The prosecution's treatment of minority jurors as compared to its treatment of nonminority jurors is among the facts indicative of the presence of a purpose to discriminate." McDaniels v. Kirkland, 813 F.3d 770, 778 (9th Cir. 2015) (*en banc*) (citing Miller-El v. Dretke, 545 U.S. 231, 241 (2005) [hereinafter, "Miller-El II"]).

In reviewing a state court's Batson determination, a federal habeas court "must accept a state court finding unless it was based on unreasonable determination of the facts in light of the evidence presented in the state court proceeding." Sifuentes v. Brazelton, 825 F.3d 506, 517–18 (9th Cir. 2016) (explaining that review is doubly deferential because a federal court defers to the state reviewing court's determination of the facts, and a reviewing court defers to the trial court's determination of the prosecutor's credibility). A federal habeas court must conduct a two-step inquiry. First, it "review[s] the relevant portions of the record and use[s] ordinary analytic tools to

1  evaluate the prosecutor's race-neutral explanations" to determine whether those justifications are
2  contrary to the evidence or plausible. See id.

3  Second, the court must determine "whether the state appellate court was objectively
4  unreasonable in upholding the trial court's determination." See id. "Even if [the federal habeas
5  court] would have reached a different conclusion regarding the prosecutor's credibility, [the court]
6  must give the state appellate court the benefit of the doubt." Felkner v. Jackson, 562 U.S. 594, 598
7  (2011).

8  Where the state court has failed to conduct a comparative juror analysis, a habeas court
9  must conduct that analysis *de novo*, rather than by remanding the case to the state courts to do so.
10 See Green v. LaMarque, 532 F.3d at 1031 (citing Miller-El II, 545 U.S. at 241). Then, it must
11 reevaluate the state decision in light of the comparative analysis and any other evidence tending to
12 show purposeful discrimination in order to determine whether the state was unreasonable in
13 finding the prosecutor's race-neutral explanations to be genuine. See Castellanos v. Small, 766
14 F.3d 1137, 1148–51 (9th Cir. 2014). Where a state court conducted an analysis of the
15 characteristics of a dismissed juror and other jurors and determined that the prosecutor did not
16 exercise her peremptory challenges in a discriminatory manner, AEDPA deference applies, and a
17 federal court need not undertake comparative analysis de novo. See Briggs, 682 F.3d at 1171 n.6.

### *iv. Analysis*

#### 1. James, Badge Number 665

20 The state appellate court's denial of Robinson's Batson challenge of James was not
21 objectively unreasonable. Robinson asserts that James never applied to work as a law enforcement
22 officer and that the State did not make a cursory inquiry as to whether she worked in law
23 enforcement. The record, however, provides that when asked if following her criminal justice
24 education, she "ever applied to be a police officer or followed up on that type of profession," James
25 responded that she applied, "but was not selected." ECF No. 21-39 at 127. On follow-up
26 questioning, she further provided that she did not apply to be a police officer, but "preferred to
27 work in conjunction with law enforcement." *Id*.

28 A comparative analysis between James and the venire members the prosecutor did not

1  challenge does not demonstrate pretext or discrimination. Robinson asserts that for venire
2  members who were not African American, the State did not inquire about relatives who had been
3  accused or convicted of crimes or of venire members who committed crimes themselves.

4  Letica Papas ("Papas"), badge number 667, provided that her deceased brother had a DUI
5  conviction in the 1990s. ECF No. 21-40 at 82. A thirty-four-year-old David Frisbie ("Frisbie"),
6  badge number 520, indicated that he was convicted of an "underage DUI" when he was 20-years-
7  old. See id. at 60–64. Papas provided that she believed that the justice system treated her brother
8  fairly and Frisbie provided that he believed he was treated fairly by the police. See id. at 64 & 82.
9  Although Papas and Frisbie had prior criminal convictions or family members with convictions,
10 such convictions were not of the same level of severity as the charge that James's brother faced—
11 i.e., voluntary manslaughter. In addition, as articulated by the prosecution in its race-neutral
12 explanation, James's brother did not have "a past conviction where he's possibly serving time or
13 a drug case that's since been closed," rather he was facing trial at the time while the criminal
14 convictions related to Papas and Frisbie were not recent or ongoing.

15 Considering the totality of the relevant facts about the prosecutor's conduct as to James,
16 including a comparative juror analysis and the explanation that James was not selected for a law
17 enforcement related position and her brother's ongoing criminal charge provided the basis for her
18 removal, the trial court could reasonably conclude the explanation for exercising the peremptory
19 challenge against James was race-neutral and that Robinson did not prove purposeful racial
20 discrimination. Accordingly, the state appellate court's rejection of Robinson's challenge
21 concerning James was neither contrary to, nor an unreasonable application of clearly established
22 law, as determined by the United States Supreme Court and was not based on an unreasonable
23 determination of facts.

### 2.  Barnes, Badge Number 533

25 The state appellate court's denial of Robinson's Batson challenge of Barnes was not
26 objectively unreasonable. Robinson opposes the State's race-neutral explanation, arguing that the
27 state appellate court's conclusions were based on unreasonable determinations of fact that no
28 purposeful discrimination occurred. A comparative analysis between Barnes and the venire

members who were also victims of crimes the prosecutor did not challenge does not demonstrate pretext or discrimination. Although several of the venire members accepted by the State had been victims of crimes, none had used more understanding or favorable language to describe the individual committing the crime against them as Barnesm, who described the individual who burglarized her home as being "very polite."

Margirit Billings ("Billings"), badge number 448, recounted an attempted robbery of her nightclub, wherein she stated, "I said what you going to do, shoot or what," to the individual trying to take money from her. See ECF No. 21-39 at 81. She also described an interaction with gang members who had threatened her providing that she "went up to them, I said, here I am, go ahead and shoot me," and that "they told everybody I was a crazy woman and to leave me alone." Id. at 79–80. Kyle King ("King"), badge number 561, described an incident where an intruder attacked him while he was sleeping. See ECF No. 21-40 at 115. Upon questioning, King described that he "choked [the intruder] until [King's] dad showed up and was able to subdue him." Id.

Michael Shanks ("Shanks"), badge number 527, described a "minor car incident," that occurred 10 years prior wherein monitors in his truck were stolen by breaking the windows of the truck. See id. at 89. Although Shanks described the incident as "minor," it appears he was qualifying the severity of the crime itself as opposed to commenting on the individual committing the crime. In addition, the State's explanation and concern was based on the facts of the case and that Robinson's co-defendant Camacho could be viewed as a "better criminal" because he "was somewhat of a protector" of one of the victims. See ECF No. 21-41 at 199.

Because a trial court's decision on the question of discriminatory intent is a finding of fact to be accorded great deference on appeal unless clear error, and the record fails to demonstrate purposeful discrimination in the challenge of Barnes, the state appellate court reasonably determined that Robinson failed to show that the State's race-neutral explanation as to Barnes was pretextual or that the State engaged in purposeful discrimination. Because the state appellate court's determination denying Robinson relief concerning Barnes and James constituted an objectively reasonable application of Batson and was not based on an unreasonable determination of the facts, Robinson is not entitled to federal habeas relief for Ground One.

### b. GROUND TWO[4]—TRIAL COURT'S DENIAL OF MOTIONS TO SEVER

In Ground Two, Robinson alleges that the trial court erred in denying his motions to sever his trial from Camacho on the basis that their defenses would likely be antagonistic. See ECF No. 20 at 13. In addition, Camacho made a statement to police that would likely offend Robinson's Sixth Amendment right to confront witnesses although ultimately the State did not enter that statement into evidence. Nonetheless, Robinson asserts that the State elicited prejudicial testimony from B.S. that would not have been admissible if Robinson and Camacho were tried separately. Robinson asserts that B.S.'s testimony included a hearsay statement by Camacho:

> **Q:** Did you hear a discussion between Mr. Camacho and Mr. Robinson at this time involving you?
>
> **A:** Yes, sir.
>
> **Q:** As best as you can, describe to this jury what was said and who said it.
>
> **A:** [Camacho] begged him not to rape me, like, over and over again. Said, Please don't rape her, dog. Please don't fucking rape her, please don't fucking rape her

ECF No. 21-45 at 122–23.

#### i. State Court Determination

The Nevada Supreme Court held:

> Robinson argues that he was prejudiced because he and his codefendant Camacho had antagonistic defenses, but he has failed to show how the misjoinder had "a substantial and injurious effect on the verdict." Id. Antagonistic defenses are not in and of themselves a basis for finding prejudicial misjoinder, they must be mutually antagonistic or irreconcilable. Chartier, 124 Nev. at 766, 191 P.3d at 1186. Defenses are mutually antagonistic or irreconcilable when "there is [a] danger that the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty." Id. at 765, 191 P.3d at 1185 (Marshall, 118 Nev. at 646, 56 P.3d at 378).
>
> Robinson argues that the defenses became irreconcilable when Camacho denied having pulled the trigger. We disagree. Neither Camacho nor the State accused Robinson of having pulled the trigger, thus making the defenses reconcilable. See, e.g., Chartier, 124 Nev. at 762–67, 191 P.3d at 1183–87 (holding that codefendants' defenses were irreconcilable when the defendant implicated the codefendant and the codefendant denied participating entirely). Robinson was charged on three bases of liability— first-degree murder, aiding and abetting, and conspiracy—and he conceded his guilt in closing argument. Because Robinson conceded guilt during his trial, he cannot demonstrate prejudice or how the jury could have unjustifiably

---

[4] Robinson's reply refers to this claim as Ground Three. However, his amended petition refers to it as Ground Two and the Court dismissed Ground Three as untimely. See ECF No. 29.

> inferred his guilt. We therefore conclude that any error in not severing the trial based on the antagonistic defenses would be harmless.
>
> Robinson also argues that severance was warranted because Camacho elicited prejudicial testimony from the victim-witness about Robinson's participation in the crime. However, Robinson failed to object to the witness's testimony during the trial, thus waiving this argument on appeal absent a showing of plain error. See Browning v. State, 124 Nev. 517, 533, 188 P.3d 60, 71 (2008) ("Generally, the failure to object precludes appellate review absent plain error."); Valdez v. State, 124 Nev. 1172, 1190, 196 P.3d 465, 477 (2008) (same). Under a plain-error review, Robinson must show that the error caused actual prejudice or miscarriage of justice. Valdez, 124 Nev. at 1190, 196 P.3d at 477. We conclude that Robinson had failed to do so since he conceded guilt in his closing argument.

ECF No. 22-24 at 6–7.

### ii. *Applicable Legal Standard*

In the context of joinder of federal defendants, the Supreme Court has stated: "Improper joinder does not, in itself, violate the Constitution. Rather, misjoinder would rise to the level of constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial." U.S. v. Lane, 474 U.S 438, 466 n.6 (1986); see also Zafiro v. U.S., 506 U.S. 534, 539 (1993) (holding that a court should grant a severance under Federal Rule of Criminal Procedure 14 "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence").

However, "[t]here is no clearly established federal law requiring severance of criminal trials in state court even when the defendants assert mutually antagonistic defenses[.]" Runningeagle v. Ryan, 686 F.3d 758, 774 (9th Cir. 2012); see also Collins v. Runnels, 603 F.3d 1127, 1132–33 (9th Cir. 2010) (hold[ing] that neither Zafiro nor Lane establish a constitutional standard binding on the states requiring severance in cases where defendants present mutually antagonistic defenses"). Rather, "the statement in Lane regarding when misjoinder rises to the level of constitutional violation was dicta and … Zafiro is not binding on the state courts because it addresses the Federal Rules of Criminal Procedure." Runningeagle, 686 F.3d at 776–77.

Under Section 2254(d)(1), "a federal court may not grant a state prisoner's habeas application unless the relevant state-court decision 'was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United

- 15 -

States.'" Knowles v. Mirzayance, 556 U.S. 111, 121 (2009) (quoting 28 U.S.C. § 2254(d)(1)). "Section 2254(d)(1)'s 'clearly established' phrase 'refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'" Lockyer v. Andrade, 538 U.S. 63, 71 (2003) (citation omitted); see also White v. Woodall, 134 S.Ct. 1697, 1702 (2014).

### iii. Analysis

In the absence of Supreme Court precedent, Robinson is not entitled to habeas corpus relief on Ground Two because Robinson has not shown that the Nevada Supreme Court acted contrary to Supreme Court precedent in determining that he was not entitled to relief on his severance claim. See Wright v. Van Patten, 552 U.S. 120, 126 (2008) ("Because our cases give no clear answer to the question presented, ... it cannot be said that the state court unreasonabl[y] appli[ed] clearly established Federal law. Under the explicit terms of § 2254(d)(1), therefore, relief is unauthorized."). Accordingly, the Court finds that no habeas relief is warranted on this claim.

### c. GROUND FOUR—INEFFECTIVE ASSISTANCE RE: FAILURE TO OBJECT

In Ground Four, Robinson alleges that trial counsel rendered ineffective assistance for failure to object to misstatements of fact and law. During closing argument, Pike, Camacho's counsel, argued that "the circumstantial evidence is much more persuasive that it was fired from the area that [Robinson] was identified as being." ECF No. 21-49 at 62–62. He asserts that Pike's misstatements include arguing that "[t]here wasn't anything found in the search of the house," highlighting that, "other than a suspect trajectory, which points toward [Robinson] doing those things." Id. at 62. In addition, Robinson alleges that Pike's closing argument further alluded that Robinson was the shooter by arguing that "the murder occurred at the most out of control individual, the most – the one that was threatening to do the most harm to anybody. And up to and including a rape." ECF No. 21-49 at 64.

Witnesses B.S. and Lucas, however, testified that Camacho was the shooter. Further, an expert witness for the State, forensic pathologist Lisa Gavin, testified that the trajectory does not identify where the shooter was standing. See ECF No. 21-47 at 86. Robinson asserts that his counsel should have objected to Pike's misrepresentations that painted Robinson as the shooter

and a rapist, which was not supported by the evidence.

### i. State Court Determination

The Nevada Court of Appeals held:

> Second, Robinson claimed counsel was ineffective for failing to object to misstatements of the facts and law his codefendant's counsel made during closing arguments. Specifically, Robinson claimed counsel should have objected to statements that the evidence showed Robinson was the shooter, he attempted to sexually assault the female victim, and his codefendant stopped him. Because Robinson conceded his guilt during his closing argument, Robinson failed to demonstrate there was a reasonable probability of a different outcome at trial had counsel objected to the statements. Therefore, we conclude the district court did not err by denying this claim.

ECF No. 23-10 at 3–4.

### ii. Analysis

The Nevada appellate court's decision is not contrary to, nor an unreasonable application of, federal law as determined by the United States Supreme Court and is not based on unreasonable determinations of fact in the state court record.

Robinson failed to demonstrate that, but for counsel's failure to object to Pike's statements during closing argument, there is a reasonable probability that the outcome of the trial would have been different. As noted by the Nevada Court of Appeals, Robinson conceded to conspiracy to commit robbery, conspiracy to commit kidnapping, and coercion during closing argument. See ECF No. 21-49 at 67. Although conceding guilt to certain crimes, Robinson argued that Camacho committed the murder and attempted murder. See id. The prosecution argued, and the jury was instructed on multiple theories of liability, including the felony murder theory and the aider and abettor theory. Beyond Robinson's concessions at closing, B.S. and Lucas's testimony provided that Robinson conspired with Camacho and that Robinson followed Camacho's instructions.

In addition, the trial court specifically instructed the jury that "[s]tatements, arguments, and opinions of counsel are not evidence in that case." ECF No. 22-45 at 17. A jury is presumed to follow the court's instructions. See Weeks v. Angelone, 528 U.S. 225, 234 (2000), and the Supreme Court has observed that "arguments of counsel generally carry less weight with a jury than do instructions from the court." Boyde v. California, 494 U.S. 370, 384 (1990). Further, Robinson's closing argument occurred after Camacho's closing argument, and counsel took the

1   opportunity to directly refute Pike's statement, highlighting that Camacho "took a gun and fired
2   into the face of two young men, killing one and horribly wounding another," and that Camacho
3   was "in charge." ECF No. 21-49 at 66–67.

4       Given that Robinson conceded to guilt of certain crimes, including conspiracy to commit
5   robbery and conspiracy to commit kidnapping, and the strength of the evidence against Robinson,
6   including Lucas's and B.S.'s testimony, even if trial counsel had objected to Pike's statements at
7   closing, there is no reasonable probability that the outcome of the proceedings would have been
8   different because the prosecution presented alternative theories of liability, including felony
9   murder and conspiracy or aiding and abetting under which the jury could have found Robinson
10  guilty. Accordingly, the Nevada Court of Appeals reasonably determined that Robinson failed to
11  demonstrate prejudice under Strickland. Robinson is therefore denied habeas relief on Ground
12  Four.

### V.   CERTIFICATE OF APPEALABILITY

This is a final order adverse to Robinson. Rule 11 of the Rules Governing Section 2254 Cases requires the Court to issue or deny a certificate of appealability ("COA"). Therefore, the Court has *sua sponte* evaluated the claims within the petition for suitability for the issuance of a COA. See 28 U.S.C. § 2253(c); see also Turner v. Calderon, 281 F.3d 851, 864–65 (9th Cir. 2002). Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c). With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000). For procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether this Court's procedural ruling was correct. See id. Applying these standards, this Court finds that a certificate of appealability is unwarranted.

26  ///
27  ///
28  ///

### VI. CONCLUSION

Therefore, **IT IS HEREBY ORDERED** that Petitioner Eric Deon Robinson's first amended petition for writ of habeas corpus (ECF No. 20) is **DENIED**.

**IT IS FURTHER ORDERED** that a certificate of appealability is **DENIED**.

**IT IS FURTHER ORDERED** that the Clerk of the Court is directed to substitute Ronald Oliver for Respondent Gabriela Najera, enter judgment accordingly, and close this case.

**DATED:** December 22, 2025.

_____
**RICHARD F. BOULWARE, II**
**UNITED STATES DISTRICT JUDGE**